FILED
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

★ APR 23 2012 ★

LONG ISLAND OFFICE

JJD:CCC
F. #2011R00447

**12 - 0410 M**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

JASON KERYC,
ANTHONY MASSARO,
ANTHONY CICCONE and
DIANE KAYLOR,

            Defendants.

- - - - - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF ARREST
WARRANTS

(T. 18, U.S.C., § 1349)

EASTERN DISTRICT OF NEW YORK, SS.:

      RICHARD CINNAMO, being duly sworn, deposes and says

that he is a Postal Inspector with the United States Postal

Inspection Service ("USPIS") duly appointed according to law and

acting as such.

      Upon information and belief, in or about and between

October 2003 and January 2009, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and

DIANE KAYLOR, together with others, did knowingly and

intentionally conspire to devise a scheme and artifice to

defraud, and to obtain money and property by means of materially

false and fraudulent pretenses, representations and promises, and

for the purpose of executing such scheme and artifice, placed and

caused to be placed in post offices and authorized depositories

for mail matters, matters and things, and deposited and caused to be deposited matters and things to be sent and delivered by private and commercial interstate carriers to wit: documents and envelopes containing checks, contrary to Title 18, United States Code, Section 1341.

(Title 18, United States Code, Section 1349)

The source of your deponent's information and grounds for his belief are as follows:[1]

1.    I have been a Postal Inspector with the USPIS for approximately fourteen years and have participated in numerous investigations of violations of federal offenses committed using the United States mail and interstate carriers.  For the past nine years, I have been assigned to units that primarily investigate fraud offenses, including, but not limited to, mail fraud, wire fraud and violations of the federal securities and commodities laws.  I am currently assigned to the Hicksville office of the USPIS.

I.   **Introduction**

2.    Since August 2008, I have participated, along with agents of the Federal Bureau of Investigation (the "FBI"), in an ongoing investigation of Agape World, Inc. ("Agape"), Agape Merchant Advance, LLC. ("AMA") and individuals associated with

---

[1]    Because the purpose of this affidavit is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

Agape and AMA.  On January 26, 2009, federal agents executed
court-authorized search warrants at Agape and AMA's offices and
seized computers and voluminous documents.  On June 16, 2009,
federal agents executed court-authorized search warrants of more
than 30 email accounts of former Agape employees, including email
accounts used by the defendants JASON KERYC, ANTHONY MASSARO,
ANTHONY CICCONE and DIANE KAYLOR, and seized numerous emails
relating to Agape and AMA.  Additionally, during the
investigation, federal agents obtained bank records and other
Agape documents, pursuant to subpoenas.  Further, other
investigators assigned to the USPIS and FBI and I have
interviewed approximately 80 individuals who invested money in
Agape and AMA.  We also interviewed numerous former Agape and AMA
employees.  The information contained in this affidavit is based
on, among other things, my own personal observations, my review
of documents, including emails to/from the defendants, my
participation in and review of consensually made recordings,
conversations with other law enforcement officers and interviews
of witnesses.

3.  To date, the investigation has revealed that the
defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and
DIANE KAYLOR, together with others, knowingly and intentionally
engaged in fraudulent activity involving the use of the United
States mail and private interstate carriers.  Specifically, the

investigation has revealed that Agape and AMA were operated in a manner consistent with what is commonly referred to as a "Ponzi scheme." A Ponzi scheme is a fraudulent scheme in which investors are lured to invest money in a business venture with promises of unusually high returns and/or profits from the investment. The high returns and/or profits are represented to investors to be generated by the business ventures themselves. However, in a Ponzi scheme, the vast majority of the money returned to investors is actually money that was obtained directly from successive investors, rather than from the business venture itself. The Ponzi scheme ultimately becomes unsustainable as the returns and/or profits promised to current investors grow to exceed the amount of money obtained from new investors. Early investors in a Ponzi scheme often receive the promised profits and, sometimes, a return of their initial investment. The apparent success of the investments is later used to encourage re-investment by original investors and to recruit new investors. New investors typically make no profits and, in fact, lose their entire original investment when the scheme ultimately collapses.

4. The defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, together with others, knowingly and intentionally engaged in a scheme to defraud individual investors by means of materially false and fraudulent representations, specifically by falsely telling investors, among

other things, that: (1) Agape provided secured short-term bridge loans to commercial borrowers that generated high interest returns; (2) Agape investor money would be used solely to fund bridge loans; (3) returns/profits on Agape's investors' money would be derived solely from interest paid by Agape's commercial borrowers; and (4) the bridge loans were a low risk venture. During the course of the investigation, we determined that Agape investor money was not used solely to fund bridge loans and that little of the investors' money was actually forwarded to commercial borrowers as loans. Instead, approximately $100 million of the investors' money was invested in high risk, unsecured commodities and futures investments, without the investors' knowledge and contrary to representations made by the defendants KERYC, MASSARO, CICCONE, KAYLOR and others. Furthermore, the investigation revealed that almost all of the money paid back to investors was actually money provided by subsequent investors, rather than interest payments provided to Agape and AMA by commercial borrowers. In fact, as set forth below, in several cases, the purported loans were never made, or the loans that were made were never repaid.

5.    As discussed below, a review of Agape and AMA records indicated that, between October 2003 and January 2009, more than 5,000 individuals invested over $400 million in Agape and AMA. Of those 5,000 investors, approximately 4,100 investors sustained actual losses totaling approximately $179 million.

Despite representations that the defendants JASON KERYC, ANTHONY

MASSARO, ANTHONY CICCONE, DIANE KAYLOR, and others working at

their direction, made to investors, only approximately $30

million of the $400 million was actually used to fund bridge or

merchant loans.

## II.   **The Defendants and the Companies**

### A.   **Agape**

6.   Agape was a New York State corporation

incorporated in August 2000.  Agape maintained offices at 150

Motor Parkway, Suite 106, Hauppauge, New York (the "Agape

Hauppauge Office"), 64-13B Grand Avenue, Maspeth, New York and

82-11 37th Avenue, Suite 602, Jackson Heights, New York

(collectively, the "Agape Offices").  Agape held itself out to be

a provider of short-term bridge loans for commercial borrowers,

which loans purportedly generated high-interest returns on

investments.

7.   Since approximately 2005, Agape obtained money

from investors purportedly for the purpose of loaning that money

to commercial borrowers in the form of bridge loans.  In its

promotional material displayed on its website, Agape stated:

> Agape World Inc. is a private bridge lender
> since 1999.  We do not provide residential
> mortgages . . .  We have private sources of
> financing for bridge loans.  Depending upon
> the borrower's time frame and the
> circumstances, interest-only loans as well as
> fixed-rate loans are available.
> Additionally, Agape World Inc. can provide

> financing at the time of acquistion, or years
> after an acquisition, in order to free
> trapped equity.  These special situation
> loans can be placed instead of or alongside
> conventional financing to provide winning
> solutions where others may only see problems.
> Our firm can fund viable transactions of any
> size.

A link on the Agape homepage labeled "Investor Information" led

to a page on which the following statement appeared:

> As our business grows, Approved Investors are
> always welcome to be a part of our fund
> raising through our brokers.  With our solid
> business infrastructure and highly accredited
> name, Agape World Inc. is foreseeing a bright
> future.  Project developers and contractors
> have sealed our  services thru 2008 and into
> the future.  We are projecting even more
> opportunities for borrowers and investors
> alike.  Agape World Inc. provides the bridge
> to your future!

The website also made certain claims regarding the rights and

benefits to be enjoyed by investors in Agape including, but not

limited to, the following: "(1) 99% security of your investment

by first position UCC filing, (2) Investors are in complete

control of their funds and are able to access at any time, and

(3) Each loan is collateralized by 100% commercial asset lien."

As set forth below, for most of Agape's bridge loans, each of

these representations was false.

        8.    On or about February 5, 2009, an involuntary

Chapter 7 petition was filed by four creditors against Agape and

others in the United States Bankruptcy Court for the Eastern

District of New York.  See In re Agape World, Inc., 09-BK-70660

(E.D.N.Y.).  On February 12, 2009, the bankruptcy court granted

that motion and appointed a trustee to oversee the bankruptcy.

**B.    AMA**

9.    AMA was a New York State limited liability

corporation incorporated in November 2007 that held itself out as

a lender to businesses that accepted credit cards.  AMA obtained

money from investors purportedly for the purpose of loaning money

to businesses at high rates of interest (hereinafter the

"merchant loans") through a company known as Professional

Merchant Advance Capital, LLC. ("PROMAC'").  AMA operated from

the Agape Offices.  AMA's website stated that such advances were

"typically taken out against a merchant's future credit card

sales."  AMA was included in the Agape bankruptcy proceedings

discussed above.

10.    According to records obtained during this

investigation, the defendants JASON KERYC, ANTHONY MASSARO,

ANTHONY CICCONE and DIANE KAYLOR, together with others, raised

approximately $50 million to fund merchant loans.  Based on Agape

bank records, between November 2007 and January 2009, AMA loaned

only approximately $5 million to PROMAC to fund merchant loans,

even though AMA had received approximately $50 million from

investors to fund merchant loans.  The records also revealed that

the overwhelming majority of the money paid by AMA to their

investors was generated from successive investments by original

investors and new investments by new investors, and not from loan repayment or interest payments made to AMA by their borrowers.

### C. PPP

11. The Premium Protection Plan, LLC. ("PPP") was a Delaware company incorporated in October 2008. PPP offered insurance policies to Agape investors purporting to insure their principal and a portion of their expected interest. The policies were supposed to insure the timely payment of principal in the case of a default by an Agape borrower. Nicholas Cosmo ("Cosmo") was the President and a 51% shareholder of PPP.

### D. Co-conspirator Nicholas Cosmo

12. Co-conspirator Nicholas Cosmo was Agape's President and owner. Cosmo was also the President of AMA and a 20% shareholder in PROMAC. Prior to forming Agape and AMA, Cosmo was convicted of mail fraud in the Eastern District of New York in the case of United States v. Nicholas Cosmo, 98-CR-089 (ADS). Between January 1999 and August 2000, Cosmo was incarcerated in a federal prison for that offense. In early August 2008, a website entitled www.fatwallet.com disclosed that Cosmo had previously been convicted of a crime. On April 23, 2009, following an investigation into the Ponzi scheme described in this Affidavit, a grand jury in this district returned an indictment in United States v. Nicholas Cosmo, 09-CR-255 (DRH) charging Cosmo with twenty-two counts of mail fraud and ten counts of wire fraud, in violation of Title 18, United States Code, Sections 1341 and

1343, respectively.  On October 29, 2010, Cosmo pled guilty to one count of mail fraud and one count of wire fraud.  On October 14, 2011, Cosmo was sentenced to a term of imprisonment of 25 years.

13.  Each of the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, who worked as account representatives or brokers for Agape and AMA, reported directly to Cosmo.  According to interviews of former Agape employees and a review of records obtained during the course of this investigation, including a review of the defendants' email accounts, the defendants had regular contact with Cosmo during the conspiracy.  Additionally, on several occasions, Cosmo and the defendants met with investors to discuss Agape and solicit money.

E.  **Defendant JASON KERYC**

14.  Between approximately November 2003 and January 2009, the defendant JASON KERYC was an account representative for Agape.[2]  Based on a review of records obtained during this investigation and interviews of former Agape employees, as an account representative, KERYC identified potential investors, solicited investors to invest in specific bridge loans and merchant loans, maintained contact with investors, maintained

---

[2]      Account representatives at Agape were also referred to as brokers.  Account representatives solicited investments for both Agape and AMA.

client bridge loan contracts, received money from investors and maintained account records for each of his investors.  KERYC also hired sub-brokers to assist him with those duties.[3]  Of the approximately 5,000 individuals who invested in Agape and AMA, approximately 1,600 of them invested with KERYC or sub-brokers working at his direction.  Based on records obtained during the course of this investigation, KERYC, and sub-brokers working at his direction, solicited and obtained approximately $699 million from investors that was supposed to be used to invest in specific bridge loans.[4]  KERYC also raised approximately $10.5 million for AMA's merchant loans.  According to Agape bank records, KERYC

---

[3]     Sub-brokers performed similar tasks to the account representatives, but instead of reporting to Cosmo and being paid by Cosmo, they reported to, and were paid by, their account representative.  A sub-broker's responsibilities included identifying potential investors, soliciting investors to invest in specific bridge loans and merchant loans and maintaining contact with investors, all on behalf of the account representative for whom they worked.

[4]     This dollar figure includes both "new money" and money that was rolled over from prior investments.  The term "new money" means money raised from new investors and additional money raised from prior investors.  The total amount of cash (or new money) that was raised by Agape purportedly for its bridge loans was approximately $363 million.  The reason for the difference between the $699 million raised by KERYC and $363 million raised by the entire company is because the $699 million is not limited to new money--it includes money that KERYC convinced investors to roll over from one bridge loan investment to the next bridge loan investment.  This is the dollar amount upon which KERYC's commission was calculated.

received approximately $16 million in commission for his and his sub-brokers' efforts.[5]

15. Based on an email recovered during this investigation, the defendant JASON KERYC was aware of Cosmo's criminal history no later than February 13, 2008. The investigation has revealed that KERYC lied to an investor about Cosmo's background. According to an investor interviewed in connection with this investigation ("Investor 1"), whose identity is known to the government, in or about 2006, KERYC told him that Cosmo was an attorney and that Cosmo had three or four partners in Agape who were also attorneys. Cosmo was not an attorney and he did not have any partners, let alone three or four partners who were attorneys.

F.  **Defendant ANTHONY MASSARO**

16. Between approximately April 2004 and January 2009, the defendant ANTHONY MASSARO was an account representative for Agape. Based on a review of records obtained during this investigation and interviews of former Agape employees, as an account representative, MASSARO identified potential investors, solicited investors to invest in specific bridge loans and merchant loans, maintained contact with investors, maintained client bridge loan contracts, received money from investors and

---

[5]     This dollar figure is the total amount of commission that KERYC received and does not take into account the fact that KERYC had to pay sub-brokers working at his direction out of these funds.

maintained account records for each of his investors. MASSARO also hired sub-brokers to assist him with those duties. Of the approximately 5,000 individuals who invested in Agape and AMA, approximately 820 of them invested with MASSARO or sub-brokers working at his direction. According to records obtained during this investigation, MASSARO, and sub-brokers working at his direction, solicited and obtained approximately $188.8 million from investors that was supposed to be used to invest in specific bridge loans.[6] He also raised approximately $2.5 million for AMA's merchant loans. Based on Agape bank records, MASSARO received approximately $6.5 million in commission for his and his sub-brokers' efforts.[7]

17. Before he worked at Agape, on November 24, 1997, the defendant ANTHONY MASSARO was convicted of heroin importation in the United States District Court for the Southern District of Florida. On March 4, 1998, he was sentenced to 57 months' imprisonment to be followed by three years of supervised release. According to United States Bureau of Prisons records, MASSARO was incarcerated at Allenwood Federal Correctional Institution from April 1998 to June 2001. From January 1999 to August 2000, Cosmo

---

[6]     As described in footnote 4, this dollar figure includes both new money and money that was rolled over from prior investments.
[7]     This dollar figure is the total amount of commission that MASSARO received and does not take into account the fact that MASSARO had to pay sub-brokers working at his direction out of these funds.

was incarcerated at that same facility.  According to an investor

interviewed in connection with this investigation ("Investor 2"),

whose identity is known to the government, in November or

December 2008, MASSARO told him that he did not know whether

Cosmo had ever been in prison.  That was a lie because in early

August 2008, shortly after Cosmo's criminal history was disclosed

on www.fatwallet.com, Cosmo told Agape employees, including

MASSARO, that he had been in prison.  MASSARO further told

Investor 2 that he met Cosmo when he became Cosmo's personal

trainer.

### G.   Defendant ANTHONY CICCONE

18.   Between approximately January 2005 and January

2009, the defendant ANTHONY CICCONE was an account representative

for Agape.  Based on a review of records obtained during this

investigation and interviews of former Agape employees, as an

account representative, CICCONE identified potential investors,

solicited investors to invest in specific bridge loans and

merchant loans, maintained contact with investors, maintained

client bridge loan contracts, received money from investors and

maintained account records for each of his investors.  CICCONE

also hired sub-brokers to assist him with those duties.  Of the

approximately 5,000 individuals who invested in Agape and AMA,

approximately 530 of them invested with CICCONE or sub-brokers

working at his direction.  Based on records obtained during the

course of this investigation, CICCONE, and sub-brokers working at

his direction, solicited and obtained approximately $319.7 million from investors that was supposed to be used to invest in specific bridge loans.[8] He also raised approximately $4 million for AMA's merchant loans. According to Agape bank records, CICCONE received approximately $10.7 million in commission for his and his sub-brokers' efforts.[9] In early August 2008, shortly after Cosmo's criminal history was disclosed on www.fatwallet.com, Cosmo told Agape employees, including CICCONE, about his criminal past.

## H. Defendant DIANE KAYLOR

19. Between approximately March 2006 and January 2009, the defendant DIANE KAYLOR was an account representative for Agape. Based on a review of records obtained during this investigation and interviews of former Agape employees, as an account representative, KAYLOR identified potential investors, solicited investors to invest in specific bridge loans and merchant loans, maintained contact with investors, maintained client bridge loan contracts, received money from investors and maintained account records for each of her investors. KAYLOR also hired sub-brokers to assist her with those duties. Of the

_____

[8]     As described in footnote 4, this dollar figure includes both new money and money that was rolled over from prior investments.
[9]     This dollar figure is the total amount of commission that CICCONE received and does not take into account the fact that CICCONE had to pay sub-brokers working at his direction out of these funds.

approximately 5,000 individuals who invested in Agape and AMA, approximately 245 of them invested with KAYLOR or sub-brokers working at her direction.  Based on records obtained during the course of this investigation, KAYLOR, and sub-brokers working at her direction, solicited and obtained approximately $59.7 million from investors that was supposed to be used to invest in specific bridge loans.[10]  She also raised approximately $551,000 for AMA's merchant loans.  In approximately April 2010, during the bankruptcy proceedings for Agape, KAYLOR admitted that she received approximately $4.75 million in commission for her efforts.  See Silverman v. Brandino Corp., 09-BK-8207 (E.D.N.Y.).

20.  Prior to being an account representative, the defendant DIANE KAYLOR worked as a bookkeeper for Agape from at least January 2006 to September 2007.[11]  In that capacity, KAYLOR performed administrative tasks and had access to Agape's bank records.  An examination of the bank records from that time period revealed that the vast majority of money coming into Agape came from investors, not from bridge loan borrowers.  In addition, those records show that Agape sent millions of dollars to a commodities trading firm, whose identity is known to the government.

---

[10]  As described in footnote 4, this dollar figure includes both new money and money that was rolled over from prior investments.
[11]  Between approximately March 2006 and September 2007, KAYLOR worked as both a bookkeeper and an account representative.

21.  In early August 2008, shortly after Cosmo's

criminal history was disclosed on www.fatwallet.com, Cosmo told

Agape employees, including the defendant DIANE KAYLOR, about his

criminal past.  On January 26, 2009, after Agape collapsed, an

investor asked KAYLOR "please don't tell me that I lost every

friggen dollar I have!!!!!!!What is going on?  Why wasn't any one

informed . . . that this man spent 21 months in prison in '99 for

FRAUD!!"  In response, KAYLOR wrote "I just learned not that long

ago about his jail time or I would have never taken this job."

Two days later, KAYLOR repeated that in another email to a

different investor.

### I.  Agape and AMA's Bank Accounts

22.  Based on my review of bank records in this case,

thirteen separate bank accounts were opened at Bank of America in

the name of Agape and another thirteen bank accounts were opened

at Bank of America in the name of AMA (the "Agape BOA Accounts").

One of the thirteen accounts in the name of Agape has clearly

been identified as the Agape operating account while the

remaining twelve accounts can be described as subsidiary

accounts.  Similarly, one of the thirteen accounts in the name of

AMA has clearly been identified as the AMA operating account

while the remaining twelve accounts can be described as

subsidiary accounts.

**J.    The Commodities Futures Trading Accounts**

        23.    In or about and between October 2003 and October
2008, Cosmo maintained trading accounts with seven different
commodities and futures trading firms located in Chicago,
Illinois (the "Trading Accounts"), whose identities are known to
the government.  A review of Agape bank and trading records
indicated that the trading accounts were funded, and trades were
executed, using money obtained from Agape and AMA investors.
According to Agape bank and trading records, from October 2003
through October 2008, more than $100 million was transferred from
Agape and AMA to the Trading Accounts.  Approximately $80 million
of that $100 million was subsequently lost in commodities
trading, with approximately $20 million returned to Agape and
AMA.  The defendants JASON KERYC, ANTHONY MASSARO, ANTHONY
CICCONE and DIANE KAYLOR did not tell any of the investors
interviewed in connection with this investigation that their
money would be used for commodities trading.  Nor did any of
Agape or AMA's promotional materials that have been obtained
during this investigation disclose that investors' money would be
used for commodities trading.

**III. Scheme to Defraud**

    **A.    Overview**

        24.    In or about and between October 2003 and January
2009, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY

CICCONE and DIANE KAYLOR, together with others, including, without limitation, Cosmo, executed a scheme to fraudulently induce investors to invest in Agape and AMA.  It was a part of the scheme to defraud that the defendants, and others working at their direction, told investors that Agape would use their investment capital to fund specific bridge loans to commercial clients (the "bridge loan clients").  Although they told investors that their money was needed to fund specific bridge loans, the defendants, and others working at their direction, solicited investments well in excess of what was needed to fund the specific loans, and thus, knew that investors' money was being used for purposes other than to fund specific bridge loans. It was a further part of the scheme that the defendants, and others working at their direction, promised investors rates of return that significantly exceeded the interest rates Agape charged its bridge loan clients and that therefore, the interest on the loans made by Agape could not possibly provide the Agape investors with the promised returns.  In order to induce investors to invest and continue investing, and to conceal the fact that the Agape loans were not generating the promised returns, Cosmo and the defendants used the excess money raised from subsequent investors to pay returns to previous investors. Additionally, in some cases, the defendants falsely overstated the loan amounts that Agape was providing to borrowers on certain

bridge loans.  Further, the defendants did not inform investors
that certain bridge loans were in default or on extension.

      25.  It was a part of the scheme that the defendants
JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR,
together with others, raised approximately $363 million to fund
specific bridge loans.  Based on a review of Agape bank records,
between October 2003 and January 2009, Agape loaned only
approximately $25 million to its bridge loan clients, even though
Agape had received approximately $363 million from investors to
fund specific bridge loans.  The records also revealed that the
overwhelming majority of the money paid by Agape to their
investors as returns on investment, in reality, was generated
from successive investments by original investors and new
investments by new investors, and not from loan repayment or
interest payments made to Agape by their borrowers.

      26.  It was a further part of the scheme that,
beginning in October 2008, the defendants JASON KERYC, ANTHONY
MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at
their direction, induced Agape investors to purchase the PPP
insurance plan.  The defendants falsely represented that
investors who purchased the insurance plan would own a portion of
the liens that purportedly secured repayment of the bridge loans.
The defendants further falsely represented that the PPP insurance
plan would be available for all new contracts starting in October
2008 and that it was available for five existing bridge loans

extended to purported borrowers.  In fact, the five bridge loans
purportedly covered by the PPP were never actually made by Agape.
Accordingly, no liens secured the repayment of those fictitious
loans and investors were not insured against the loss of their
money.

27.  According to investors interviewed in connection
with this investigation and records obtained during the
investigation, the defendants JASON KERYC, ANTHONY MASSARO,
ANTHONY CICCONE and DIANE KAYLOR, together with others,
including, without limitation, Cosmo, made and caused to be made,
materially false and fraudulent representations, as described
herein, in correspondence and promotional materials for Agape and
AMA, which were sent to potential investors via the U.S. Mail.
According to investors interviewed in connection with this
investigation and records obtained during the investigation, on
several occasions, KERYC, MASSARO, CICCONE and KAYLOR, together
with others, sent contracts memorializing the bridge loan
investments via the U.S. Mail.  Additionally, it was a part of
the scheme that the defendants, together with others, directed
investors to mail checks to the Agape Offices via the U.S. Mail.

28.  An examination of the Agape bridge loans, or in
several cases purported bridge loans, illustrates that the
defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and
DIANE KAYLOR, together with others, repeatedly lied to investors
about what their investments would be used for, did not tell them

that Agape's business model was incapable of supporting the
exorbitant returns promised to investors and failed to disclose
that certain bridge loans were in default or on extension.
Information regarding eleven particular loans is provided
below.[12]

### B.   Legacy Village Loan

29.   According to investors interviewed in connection
with this investigation and records obtained during this
investigation, in or about March 2006, the defendants JASON
KERYC, ANTHONY CICCONE and DIANE KAYLOR, and others working at
their direction, contacted them about investing in a bridge loan
known as Legacy Village (the "Legacy Village Loan").[13]  According
to investors and Agape contracts that KERYC, CICCONE and KAYLOR,
and others working at their direction, sent to investors in
connection with the Legacy Village Loan, the defendants told
investors that the term of the loan was approximately 42 days and
promised that Agape would pay investors approximately 14%
interest for those 42 days, which equates to an annual interest
rate of approximately 122%.[14]  The defendants assured investors

---

[12]    The investigation has revealed other bridge loans that
are not detailed herein.
[13]    To date, I have not seen any records indicating that
the defendant ANTHONY MASSARO raised money for the Legacy Village
Loan.
[14]    A review of Agape contracts revealed that the
defendants, and others working at their direction, routinely
offered investors different rates of interest for the same
contract depending on who the investor was and their relationship
to the investor.

that there was little risk that they would lose money on this investment.  Indeed, they told investors that there was only a 1% risk of loss of their investment.  As a result, investors gave Agape approximately $5.9 million for the Legacy Village Loan.[15] A review of records obtained during this investigation revealed that KERYC, CICCONE and KAYLOR, and others working at their direction, raised approximately $935,000, $3.6 million and $115,000, respectively, for the Legacy Village Loan.[16]

30.  On March 3, 2006, Cosmo sent an email to the defendants JASON KERYC, ANTHONY CICCONE, ANTHONY MASSARO and other Agape employees informing them that the amount of the Legacy Village Loan was between $900,000 and $1,000,000.  Despite the fact that the Legacy Village Loan borrower only needed between $900,000 and $1 million, KERYC and CICCONE, and others working at their direction, personally raised more than that amount.  Indeed, as set forth above, CICCONE and his sub-brokers raised approximately $3.6 million (three and a half times the actual amount of the loan), while KERYC and his sub-brokers raised approximately $935,000.  As the defendants knew, Agape employed other brokers who were also raising money for this loan.

---

[15]     This figure represents the total amount of money raised by Agape for the Legacy Village Loan, which includes what the defendants raised as well as what other Agape account representatives raised.
[16]     When I list the money raised by the defendants or Agape, I am referring to both old and new money unless I specifically indicate otherwise.  This is the dollar amount upon which the defendants' commissions were calculated.

Indeed, as discussed above, Agape representatives raised a total of approximately $5.9 million for the Legacy Village Loan. Additionally, in an email dated November 5, 2007, KERYC forwarded a spreadsheet to CICCONE documenting that he had raised approximately $935,000 for the Legacy Village Loan. Accordingly, KERYC and CICCONE knowingly lied to investors when they assured them that their money would specifically be used to fund only the Legacy Village Loan. A review of Agape bank records indicated that the vast majority of the money raised for the Legacy Village Loan was used to pay other investors or for commodities trading. As set forth below, KERYC and CICCONE continued to solicit and accept money from investors for Agape and AMA.

31. A review of Agape bank records revealed that Agape did not lend any money to Legacy Village. Those records further indicated that, at the purported conclusion of the Legacy Village Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC and ANTHONY CICCONE received commissions for that loan, despite the fact that the Legacy Village Loan was never made. Indeed, I have examined Agape checks payable to investors, KERYC and CICCONE from Agape containing the name Legacy Village on the memo line of the check.

32. None of the defendants JASON KERYC's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Legacy Village Loan.

Nor were they told that the money that they invested in the Legacy Village Loan was being used for any purpose other than a bridge loan to Legacy Village, or that the Legacy Village Loan was never made. They also were not told that the money returned to them was actually money that was obtained from successive investors, rather than from the Legacy Village Loan.

### C.  Gala Resources Loan

33.  According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about January 2007, the defendants JASON KERYC, ANTHONY CICCONE, ANTHONY MASSARO and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as Gala Resources (the "Gala Resources Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the Gala Resources Loan, the defendants told investors that the term of the loan was approximately 56 days and promised that Agape would pay investors approximately 14% interest for those 56 days, which equates to an annual interest rate of approximately 91%. The defendants assured investors that there was little risk that they would lose money on this investment. Indeed, they told investors that there was only a 1% risk of loss of their investment. As a result, investors gave Agape approximately $26.3 million for the Gala

Resources Loan.[17]  A review of records obtained during this investigation revealed that KERYC, CICCONE, MASSARO and KAYLOR, and others working at their direction, raised approximately $7.3 million, $8.3 million, $1.1 million and $1.1 million, respectively, for the Gala Resources Loan.

34.  On January 3, 2007, Cosmo sent an email to the defendants JASON KERYC, ANTHONY CICCONE, ANTHONY MASSARO and other Agape employees informing them that the amount of the Gala Resources Loan was $8.2 million.  Despite the fact that the bridge loan borrower only needed $8.2 million, CICCONE personally raised more than that amount.  CICCONE, and others working at his direction, raised approximately $8.3 million and, as CICCONE knew, Agape employed other brokers who were also raising money for this loan.  Indeed, as discussed above, CICCONE knew that KERYC raised approximately $7.3 million for the Gala Resources Loan because he received KERYC's spreadsheet in an email on November 5, 2007 that documented this fact.  Accordingly, CICCONE knowingly lied to investors when he assured them that their money would specifically be used to fund only the Gala Resources Loan. A review of Agape bank records indicated that the vast majority of the money raised for the Gala Resources Loan was used to pay other investors or for commodities trading.  As set forth below,

---

[17]    This figure represents the total amount of money raised by Agape for the Gala Resources Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

CICCONE continued to solicit and accept money from investors for Agape.

35. A review of Agape bank records revealed that Agape did not lend any money to Gala Resources. Those records further indicated that, at the purported conclusion of the Gala Resources Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC, ANTHONY CICCONE and ANTHONY MASSARO received commissions for that loan, despite the fact that the Gala Resources Loan was never made. Indeed, I have examined checks payable to investors, KERYC, MASSARO and CICCONE from Agape containing the name Gala on the memo line of the check.

36. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Gala Resources Loan. Nor were they told that the money that they invested in the Gala Resources Loan was being used for any purpose other than a bridge loan to Gala Resources, or that the Gala Resources Loan was never made. They were not told that the money returned to them was actually money that was obtained from successive investors, rather than from the Gala Resources Loan.

D. **United Steel Loan**

37. According to investors interviewed in connection with this investigation and records obtained during this

investigation, in or about June 2007, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as United Steel (the "United Steel Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the United Steel Loan, the defendants told investors that the term of the loan was approximately 70 days and promised that Agape would pay investors approximately 14% interest for those 70 days, which equates to an annual interest rate of approximately 73%. As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment. Indeed, they told investors that there was only a 1% risk of loss of their investment. As a result, investors gave Agape approximately $57.2 million for the United Steel Loan.[18]  A review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised approximately $19.8 million, $6.4 million, $15.7 million and $2.9 million, respectively, for the United Steel Loan.

38.  The investigation has revealed that detailed information about the bridge loan borrowers was maintained in

_____

[18]  This figure represents the total amount of money raised by Agape for the United Steel Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

binders that were kept in a main office area of the Agape Hauppauge Office.[19] These binders contained the actual loan terms, including the total amount of the loan, the interest rate being paid by the borrower and the duration of the loan. According to an interview of a cooperating witness, he/she observed each of the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR reviewing these binders during the conspiracy.[20] In addition to the information contained within the binder, the spines of several binders indicated the name of the borrower, the total amount of the loan and the date of loan. Therefore, the defendants had access to complete details of those loans and could determine the dollar amount of those loans without even opening the binder.

39. A review of the binder containing the loan documents for the United Steel Loan revealed that the amount of the loan was approximately $1.1 million. This information was also prominently displayed on the spine of the binder. According to an interview of one of defendant JASON KERYC's sub-brokers ("Sub-broker 1"), whose identity is known to the government, in the summer of 2007, KERYC told Sub-broker 1 that he had reviewed

---

[19] These binders were later moved to the office of the loan underwriter, which was in the Agape Hauppauge Office. Even after the binders were moved, they remained accessible to Agape employees.

[20] The cooperating witness has proven to be reliable as information provided by him/her has been corroborated by other sources, including other witnesses, recorded conversations and records obtained during this investigation.

Agape's loan documents. Similarly, according to an interview of one of KERYC's investors ("Investor 3"), whose identity is known to the government, KERYC told Investor 3 that he had reviewed Agape loan documents.

40. A review of Agape bank records revealed that, on or about June 5, 2007, Agape sent a wire transfer in the amount of $862,046, which represented the principal for the United Steel Loan. That amount was significantly less than what the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, raised for that loan. In fact, as set forth above, each of the defendants, and others working at their direction, personally raised more than the actual amount Agape needed to fund the United Steel Loan and the loan amount listed in the United Steel Loan binder. For example, KERYC raised nineteen times the actual amount of the loan; MASSARO raised six times the actual amount of the loan; CICCONE raised fifteen times the actual amount of the loan; and KAYLOR raised almost three times the actual amount of the loan. Additionally, the actual interest rate for the United Steel Loan was 13.5% for one year, not 14% for 70 days (which would have equaled 73% for one year). Accordingly, it would have been impossible for Agape to pay investors 14% interest for a 70-day investment with interest money derived from the United Steel Loan borrower. A review of Agape bank records indicated that the

money that Agape paid to individuals that invested in the United

Steel Loan came from other Agape investors.

41.   A review of records obtained during this

investigation also indicated that, at the purported conclusion of

the United Steel Loan, investors received payments for purported

returns on their investments and the defendants JASON KERYC,

ANTHONY MASSARO and DIANE KAYLOR received commissions for that

loan, despite the fact that the United Steel Loan was never

repaid.   Indeed, I have examined Agape checks payable to

investors, KERYC, MASSARO and KAYLOR from Agape containing the

name United Steel on the memo line of the check.   Moreover, on or

about April 1, 2008, the defendant ANTHONY CICCONE wrote an email

to Cosmo in which he stated that he earned a commission of

approximately $915,000 for his work on the United Steel Loan, an

amount that exceeded the total amount ($862,046) that was

actually made to the borrower.

42.   None of the defendants JASON KERYC's, ANTHONY

MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that

have been interviewed in connection with this investigation were

told that Agape had raised more money than was needed for the

United Steel Loan.   Nor were they told that the money that they

invested in the United Steel Loan was being used for any purpose

other than a bridge loan to United Steel, or that the United

Steel Loan had not been repaid.   They also were not told that the

money returned to them was actually money that was obtained from successive investors, rather than from the United Steel Loan.

**E.   Carillon Park Loan**

43.   According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about September 2007, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as Carillon Park (the "Carillon Park Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the Carillon Park Loan, the defendants told investors that the term of the loan was approximately 30 days and promised that Agape would pay approximately 9% interest for those 30 days, which equates to an annual interest rate of approximately 108%. As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment. Indeed, they told investors that there was only a 1% risk of loss of their investment. As a result, investors gave Agape approximately $12.3 million for the Carillon Park Loan.[21] A review of records obtained during this investigation revealed

---

[21]   This figure represents the total amount of money raised by Agape for the Carillon Park Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

that KERYC, MASSARO, CICCONE and KAYLOR, and others working at

their direction, raised approximately $6.1 million, $850,000,

$2.5 million and $975,000, respectively, for the Carillon Park

Loan.

    44.   A review of the binder containing the loan

documents for the Carillon Park Loan revealed that the amount of

the loan was approximately $1.4 million.  A review of Agape bank

records revealed that, on or about October 29, 2007, Agape sent a

wire transfer in the amount of $1,013,916, which represented the

principal for the Carillon Park Loan.  That amount was

significantly less than what the defendants JASON KERYC and

ANTHONY CICCONE raised for that loan.  In fact, as set forth

above, KERYC and CICCONE, and others working at their direction,

personally raised more than the amount that Agape actually needed

to fund the Carillon Park Loan and the loan amount listed in the

Carillon Park Loan binder.  KERYC raised almost four times the

actual amount of the loan and CICCONE raised almost two times the

actual amount of the loan.  Additionally, the actual interest

rate for the Carillon Park Loan was 14% for one year, not 9% for

30 days (which would have equaled 108% for one year).

Accordingly, it would have been impossible for Agape to pay

investors 9% interest for a 30-day investment with interest money

derived from the Carillon Park Loan borrower.  A review of Agape

bank records indicated that the money that Agape paid to

individuals that invested in the Carillon Park Loan came from

other Agape investors.

45.   In addition to having access to the binders

containing the terms of the Carillon Park Loan, the defendant

JASON KERYC knew that he personally raised more than the total

amount that Agape needed to fund the Carillon Park Loan.  In an

email dated September 17, 2007, KERYC advised one of his sub-

brokers that the amount of the Carillon Park Loan was $4 million.

As discussed above, the actual amount of the loan was $1.4

million.  Putting that aside, even if KERYC mistakenly believed

that the Carillon Park Loan amount was $4 million, he

nevertheless raised significantly more money than that by

himself.  As set forth above, KERYC, and others working at his

direction, raised approximately $6.4 million, and KERYC knew that

other account representatives also raised money for this loan.

Indeed, on October 12, 2007, KERYC received an email from Cosmo

containing a spreadsheet that indicated that Agape account

representatives had collectively raised approximately $12.3

million for the Carillon Park Loan--more than eight and a half

times the actual loan amount and more than three times the amount

of the loan that KERYC stated in his September 17, 2007 email.

Accordingly, KERYC knowingly lied when he assured investors that

their money would specifically be used to fund only the Carillon

Park Loan.  A review of Agape bank records indicated that the

vast majority of the money raised for the Carillon Park Loan was used to pay other investors or for commodities trading.

46. The investigation revealed that the defendant JASON KERYC also knew that the actual interest rates paid by Agape's borrowers could not support the interest that Agape paid to its investors. In October 2007, KERYC and one of his sub-brokers were contacted by a potential bridge loan borrower. They asked Agape's bridge loan underwriter for information regarding potential loan terms for this borrower. In response, on October 26, 2007, the loan underwriter sent an email to KERYC and others that set forth Agape's loan terms for a typical bridge loan. Specifically, the loan underwriter wrote that Agape charged interest rates "between 13-15% plus 3-5 points" and that "[Agape's] loan terms [were] 12 months." In that email, the loan underwriter advised KERYC to "please use this information as a basis for other files." Contrary to these disclosed loan terms, KERYC and the other defendants repeatedly promised investors returns on their investment that were significantly higher than what the loan underwriter indicated.

47. An email that the defendant JASON KERYC received on May 14, 2008 further establishes that KERYC knew that the interest rates that Agape charged to its bridge loan borrowers were insufficient to support the exorbitant interest rates that Agape paid to its investors. Specifically, Agape's bridge loan underwriter sent KERYC and another person an email attaching a

document entitled "Agape World Underwriting Guidelines for Loan
Application." That document stated "Agape WORLD INC. shall
disburse loans at a 13-15% interest only per annum rate that will
be determined by our internal credit risk department." That
interest rate was significantly lower than the rates that Agape
promised to pay, and actually paid to, its investors.

48. A review of Agape's bank records also indicated
that, at the purported conclusion of the Carillon Park Loan,
investors received payments for purported returns on their
investments and the defendants JASON KERYC, ANTHONY MASSARO and
DIANE KAYLOR received commissions for that loan, despite the fact
that the Carillon Park Loan was never repaid. Indeed, I have
examined Agape checks payable to investors, KERYC, MASSARO and
KAYLOR from Agape containing the name Carillon Park on the memo
line of the check. Moreover, on or about April 1, 2008, the
defendant ANTHONY CICCONE wrote an email to Cosmo in which he
stated that he earned a commission of approximately $85,000 for
his work on the Carillon Park Loan.

49. Between September 23, 2008 and September 26, 2008,
the defendant ANTHONY MASSARO received copies of an email
exchange between Cosmo and an attorney representing Carillon Park
in which it was made clear that the Carillon Park Loan was never
repaid. By that date, the Carillon Park Loan should have been
repaid a year earlier--in October 2007. According to Agape bank
records, investors, including investors brought in by MASSARO,

were paid purportedly for their investment in Carillon Park. In addition, MASSARO was paid a commission for this loan. Despite knowing this, MASSARO continued to solicit and accept money from investors for Agape as set forth below.

50. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Carillon Park Loan. Nor were they told that the money that they invested in the Carillon Park Loan was being used for any purpose other than a bridge loan to Carillon Park, or that the Carillon Park Loan had not been repaid. They also were not told that the money returned to them was actually money that was obtained from successive investors, rather than from the Carillon Park Loan.

F. **Clemson Grande Loan**

51. According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about October 2007, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as Clemson Grande (the "Clemson Grande Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the Clemson Grande Loan, the defendants told investors that the term of the loan was

approximately 70 days and promised that Agape would pay approximately 14% interest for those 70 days, which equates to an annual interest rate of approximately 73%.  As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment.  Indeed, they told investors that there was only a 1% risk of loss of their investment.  As a result, investors gave Agape approximately $68.3 million for the Clemson Grande Loan.[22] A review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised approximately $24.5 million, $9.4 million, $14.5 million and $2.5 million, respectively, for the Clemson Grande Loan.

52.   A review of the binder containing the loan documents for the Clemson Grande Loan revealed that the amount of the loan was approximately $5.6 million.  This information was also prominently displayed on the spine of the binder.  In addition to having access to the binder containing the actual terms of the Clemson Grande Loan, the defendant JASON KERYC knew the actual terms of the loan because, according to an interview of Sub-broker 1, Sub-broker 1 reviewed that binder and informed KERYC that the Clemson Grande Loan was for approximately $5

---

[22]   This figure represents the total amount of money raised by Agape for the Clemson Grande Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

million, not $20 million like KERYC told him and investors. On a subsequent visit to the Agape Hauppauge Office, Sub-broker 1 noticed that the aforementioned binders, which had previously been openly displayed, were no longer conspicuously displayed.

53. A review of Agape bank records revealed that, on or about October 12, 2007, Agape sent a wire transfer in the amount of $4.2 million, which represented the principal for the Clemson Grande Loan. That amount was significantly less than what the defendants JASON KERYC, ANTHONY MASSARO and ANTHONY CICCONE, and others working at their direction, raised for that loan. In fact, as set forth above, KERYC, MASSARO and CICCONE, and others working at their direction, personally raised more than the actual Clemson Grande Loan and the loan amount listed in the Clemson Grande Loan binder. KERYC raised more than four times the actual amount of the loan, MASSARO raised more than one and a half times the actual amount of the loan, and CICCONE raised two and a half times the actual amount of the loan. Additionally, the actual interest rate for the Clemson Grande Loan was 14% for one year, not 14% for 70 days (which would have equaled 73% for one year). Accordingly, it would have been impossible for Agape to pay investors 14% interest for a 70-day investment with interest money derived from the Clemson Grande Loan borrower. A review of Agape bank records indicated that the money that Agape paid to individuals that invested in the Clemson Grande Loan came from other Agape investors.

40

54. A review of the Agape bank records also indicated that, at the purported conclusion of the Clemson Grande Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR received commissions for that loan, despite the fact that the Clemson Grande Loan was never repaid. Indeed, I have examined Agape checks payable to investors, KERYC, MASSARO, CICCONE and KAYLOR from Agape containing the name Clemson Grande on the memo line of the check.

55. On October 31, 2008, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR learned that the Clemson Grande Loan had not been repaid, despite the fact that they had been paid commissions and despite the fact that investors had been paid interest and principal for that loan. In fact, the defendants, and other Agape employees, received an email from Cosmo informing them that the Clemson Grande Loan had not been repaid and that the property may be foreclosed. By that date, the Clemson Grande Loan should have been repaid almost a year earlier--in December 2007. According to Agape bank records, investors were paid returns on their investment in the Clemson Grande Loan. In addition, the defendants were paid commissions for raising money for this loan. None of the investors interviewed in connection with this investigation were told that the Clemson Grande Loan was not repaid. Instead of informing

41

their investors of this material fact, the defendants continued to raise money from investors for Agape as set forth below.

56.    None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Clemson Grande Loan.  Nor were they told that the money that they invested in the Clemson Grande Loan was being used for any purpose other than a bridge loan to Clemson Grande, or that the Clemson Grande Loan had not been repaid.  They also were not told that the money returned to them was actually money that was obtained from successive investors, rather than from the Clemson Grande Loan.

G.    **114 Parkway Drive Loan**

57.    According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about December 2007, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about another bridge loan investment.  According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with this loan, the defendants stated that the loan was for a "repeat Agape World clientele" that would be used to purchase and renovate a sports complex at 114 Parkway Drive South, Hauppauge, New York (the "114

Parkway Drive Loan"). According to investors and Agape contracts

that the defendants, and others working at their direction, sent

to investors in connection with this loan, the defendants told

investors that the term of the loan was approximately 49 days and

promised that Agape would pay approximately 14% interest for

those 49 days, which equates to an annual interest rate of 104%.

As with the bridge loans described above, the defendants assured

investors that there was little risk that they would lose money

on this investment. Indeed, they told investors that there was

only a 1% risk of loss of their investment. As a result,

investors gave the defendants more than $100.9 million for the

114 Parkway Drive Loan.[23] A review of records obtained during

this investigation revealed that KERYC, MASSARO, CICCONE and

KAYLOR, and others working at their direction, raised

approximately $41.1 million, $12.3 million, $25.6 million and

$5.3 million, respectively, for the 114 Parkway Drive Loan.

58. There was no borrower for the 114 Parkway Drive

Loan. Instead, the property was purchased using Agape funds.[24]

The defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and

---

[23] This figure represents the total amount of money raised
by Agape for the 114 Parkway Drive Loan, which includes what the
defendants raised as well as what other Agape account
representatives raised.
[24] A review of Agape bank records revealed that, on
December 3, 2007, Cosmo withdrew $175,000 from Agape's bank
accounts to make a down payment on this property. On March 14,
2008, $3.13 million was withdrawn from Agape's bank accounts to
purchase this property.

DIANE KAYLOR knew that the sports complex at 114 Parkway Drive was owned by Agape because the names of the entities that Agape owned were prominently displayed on a wall in the Agape Hauppauge Office and the name of this facility was listed on that wall, which I saw when I executed a search warrant of the Agape Hauppauge Office.  Also, on June 20, 2008, Cosmo forwarded KERYC a link to the website for this property directing KERYC to "check this out."  KERYC responded "looks sick[.]  I want to come see it one of these days."  Additionally, on or about August 29, 2008, an article was published in the Long Island Business News stating that Cosmo purchased a former paintball arena in Hauppauge for $3.85 million and intended to convert it into an indoor athletic facility.[25]  On September 9, 2008, KAYLOR forwarded a copy of that article to Cosmo.

59.  The purchase price of the 114 Parkway Drive property was significantly lower than the amount of money raised by the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction.  The binder containing the loan documents for the 114 Parkway Drive Loan revealed that the actual amount of the loan was approximately $3.5 million.  According to records obtained during this investigation, Agape purchased the property for

---

[25]   The actual purchase price of the property was $3.5 million, not $3.85 million.

approximately $3.5 million, but Agape raised approximately $100.9 million purportedly for this bridge loan. As set forth above, each of the defendants personally raised more than the purchase price of the property. In fact, KERYC raised approximately $41.1 million (more than ten times the actual purchase price); MASSARO raised approximately $12.3 million (more than three times the actual purchase price); CICCONE raised approximately $25.6 million (more than six times the actual purchase price); and KAYLOR raised approximately $5.3 million (almost one and a half times the actual purchase price).

60. A review of the Agape bank records also indicated that, at the purported conclusion of the 114 Parkway Drive Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC, ANTHONY CICCONE and DIANE KAYLOR received commissions for that loan. Indeed, I have examined Agape checks payable to investors, KERYC, CICCONE and KAYLOR from Agape containing the name 114 Parkway Drive South on the memo line of the check.

61. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that this property was owned by Agape. Nor were they told the 114 Parkway Loan was for Agape. Instead, KERYC, MASSARO, CICCONE and KAYLOR falsely claimed that the 114 Parkway Drive Loan was for a "repeat Agape World clientele." Additionally,

none of those investors were told that Agape had raised more money than was needed for the purchase of the 114 Parkway Drive property.  They also were not told that the vast majority of the money returned to them was actually money that was obtained from successive investors, rather than from the 114 Parkway Drive Loan.

### H.    508 W. 25th Partners Loan

62.   According to investors interviewed in connection with this investigation, in or about March 2008, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as 508 West 25th Partners (the "508 Loan").  According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the 508 Loan, the defendants told investors that the term of the loan was approximately 58 days and promised that Agape would pay approximately 14% interest for those 58 days, which equates to an annual interest rate of approximately 88%.  As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment.  Indeed, they told investors that there was only a 1% risk of loss of their investment.  As a result, investors gave Agape approximately $13.7 million for the

508 Loan.[26]  A review of records obtained during this

investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR,

and others working at their direction, raised approximately $6.5

million, $946,000, $453,000 and $821,000, respectively, for the

508 Loan.

63.  A review of the binder containing the loan

documents for the 508 Loan revealed that the amount of the loan

was approximately $590,000.  A review of Agape bank records

revealed that, on or about March 6, 2008, Agape sent a wire

transfer in the amount of $525,000, which represented the

principal for the 508 Loan.  That amount was significantly less

than what the defendants JASON KERYC, ANTHONY MASSARO and DIANE

KAYLOR, and others working at their direction, raised for that

loan.  In fact, as set forth above, KERYC, MASSARO and KAYLOR,

and others working at their direction, personally raised more

than the actual 508 Loan and the loan amount listed in the 508

Loan binder: KERYC raised eleven times the actual amount of the

loan; MASSARO raised one and a half times the actual amount of

the loan; and KAYLOR raised almost one and a half times the

actual amount of loan.  Additionally, the actual interest rate

for the 508 Loan was 14% for one year, not 14% for 58 days (which

would have equaled 88% for one year).  Accordingly, it would have

---

[26]     This figure represents the total amount of money raised
by Agape for the 508 Loan, which includes what the defendants
raised as well as what other Agape account representatives
raised.

been impossible for Agape to pay investors 14% interest for a 58-day investment with interest money derived from the 508 Loan borrower.  A review of Agape bank records indicated that the vast majority of money that Agape paid to individuals that invested in the 508 Loan came from other Agape investors.

      64.  In addition to having access to the binders containing the actual terms of the 508 Loan, according to an interview of Sub-broker 1 and an email dated October 6, 2008, the defendant JASON KERYC was told that the actual amount of the loan was less than he raised.  Indeed, in an email dated October 6, 2008, Sub-broker 1 told KERYC that he had hired a company to perform due diligence on the 508 Loan and informed KERYC that the investigation revealed that the total amount of the 508 Loan was only $590,000.  As discussed above, KERYC personally raised more than $6.5 million for the 508 Loan.  In that same email, Sub-broker 1 further told KERYC that Agape did not have a first position lien on the 508 Loan, which was directly contrary to what KERYC and his sub-brokers told investors.  Specifically, the email stated:

> Due diligence was also performed for the 508
> West Project. [A title company, whose
> identity is known to the government,] was
> contracted to investigate all open liens and
> mortgages for 508 West 25th street property.
> The only record connecting Agape to the
> project was a small subordinate mezzanine
> loan for $590,000.  There was no record of
> the large 40 million dollar bridge loan spoke
> of by Nicholas Cosmo during the investor
> meeting with [Sub-broker 1's company, whose

> identity is known to the government].  There
> was no record of additional phases (Phase 2
> contract: May 14, 2008-July 18, 2008; Phase 3
> contract: August 4, 2008 - October 17, 2009)
> on record.  Furthermore, ACRIS shows the
> development rights for the 508 West 25th
> project were given to [a realty company,
> whose identity is known to the government,]
> for around 2 million dollars on 6/30/08.

According to the defendants' investors that have been interviewed

in connection with this investigation, KERYC did not relay this

information to any of them.  Nor did KERYC stop raising money for

Agape.  Instead, after receiving this email, KERYC, and others

working at his direction, raised approximately $19.8 million in

new money from investors.[27]

65.  Not only did the defendant JASON KERYC withhold

the information that he learned from Sub-broker 1's investigation

from his investors, but he also affirmatively lied about the

status of the 508 Loan.  For example, on October 17, 2008--eleven

days after learning the results of Sub-broker 1's due diligence--

KERYC wrote an email to an investor stating "everything is good

with the [508 Loan Phase 3]."  KERYC also admonished his sub-

brokers for not convincing investors to reinvest the money they

invested in the 508 Loan into other bridge loans.  Specifically,

on October 29, 2008, KERYC wrote in an email addressed to his

sub-brokers "on the [508 Loan] phase III we had an extremely

---

[27]   As described above, new money does not include money
that the defendants convinced investors to roll over from a prior
bridge loan.  It only includes money raised from new investors or
additional money raised from prior investors.

large check request . . . I understand this environment is tough but we need to be tougher. . . . guys this is our jobs at risk here. . . we need to work harder at trying keep these people in the loans."

66. A review of Agape bank records also indicated that, at the purported conclusion of the 508 Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC, ANTHONY MASSARO and DIANE KAYLOR received commissions for that loan. I have examined Agape checks payable to investors, KERYC, MASSARO and KAYLOR from Agape containing either the name 508 West Partners or 508 West Partners Phase 2 on the memo line of the check.

67. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors interviewed in connection with this investigation were told that Agape had raised more money than was needed for the 508 Loan. Nor were they told that the money that they invested in the 508 Loan was being used for any purpose other than a bridge loan to 508 West Partners. They also were not told that the vast majority of the money returned to them was actually money that was obtained from successive investors, rather than from the 508 Loan.

I. **Goldan Loan**

68. According to investors interviewed in connection with this investigation and records obtained during this

investigation, in or about April 2008, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as Goldan (the "Goldan Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the Goldan Loan, the defendants told investors that the term of the loan was approximately 70 days and promised that Agape would pay approximately 12% interest for those 70 days, which equates to an annual interest rate of approximately 63%. As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment. Indeed, they told investors that there was only a 1% risk of loss of their investment. As a result, investors gave Agape approximately $30.1 million for the Goldan Loan.[28] A review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised more approximately $14.1 million, $3.9 million, $2.3 million and $2.2 million, respectively, for the Goldan Loan.

69. A review of the binder containing the loan documents for the Goldan Loan claimed that the amount of the loan

---

[28] This figure represents the total amount of money raised by Agape for the Goldan Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

was approximately $3.5 million.  However, according to a

representative of Goldan and a review of Agape bank records,

Agape only loaned Goldan $500,000.  That amount was significantly

less than what the defendants JASON KERYC, ANTHONY MASSARO,

ANTHONY CICCONE and DIANE KAYLOR, and others working at their

direction, raised for that loan.  In fact, as set forth above,

each of the defendants personally raised more than the actual

amount of the Goldan Loan.  KERYC raised 28 times the actual

amount of the loan; MASSARO raised more than eight times the

actual amount of the loan; CICCONE raised more than four times

the actual amount of the loan; and KAYLOR raised more than four

times the actual amount of loan.  Additionally, the actual

interest rate for the Goldan Loan was 15% for one year, not 12%

for 70 days (which would have equaled 63% for one year).

Accordingly, it was impossible for Agape to pay investors 14%

interest for a 70-day investment with interest money derived from

the Goldan Loan borrower.  A review of Agape bank records

indicated that the vast majority of money that Agape paid to

individuals that invested in the Goldan Loan came from other

Agape investors.

70.  In addition to having access to the binders

containing the purported terms of the Goldan Loan, according to

an interview of Sub-broker 1 and an email dated October 6, 2008,

the defendant JASON KERYC was told that the actual amount of the

Goldan Loan was significantly lower than what KERYC raised for

that loan. Indeed, according to Sub-broker 1, he contacted a representative of Goldan and learned that Goldan had borrowed $500,000. As discussed above, KERYC, and sub-brokers working at his direction, had raised approximately $14.1 million for the Goldan Loan. Shortly thereafter, Sub-broker 1 relayed this information to KERYC in an email dated October 6, 2008. In that same email, Sub-broker 1 further told KERYC that Agape did not have a first position lien on the Goldan Loan, which was directly contrary to what KERYC and his sub-brokers told investors. In response, KERYC stated that there were additional phases in the Goldan project. Sub-broker 1 spoke to a representative of Goldan who told him that KERYC's statement was not true. Goldan did not borrow any additional money from Agape. Again, Sub-broker 1 relayed this information to KERYC. According to the defendants' investors that have been interviewed in connection with this investigation, KERYC did not relay this information to any of them. Nor did KERYC stop raising money for Agape. Instead, after receiving this information, KERYC, and others working at his direction, raised approximately $19.8 million in new money from investors.

71. A review of the Agape bank records also indicated that, at the purported conclusion of the Goldan Loan, investors received payments for purported returns on their investments and the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR received commissions for that loan. Indeed, I have

examined Agape checks payable to investors, KERYC, MASSARO, CICCONE and KAYLOR from Agape containing either the name Goldan or Goldan Phase 2 on the memo line of the check.

72.   None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Goldan Loan. Nor were they told that the money that they invested in the Goldan Loan was being used for any purpose other than a bridge loan to Goldan.   They also were not told that the vast majority of money returned to them was actually money that was obtained from successive investors, rather than from the Goldan Loan.

J.   **144 East 30th Street Loan**

73.   According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about July 2008, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as 144 East 30th Street (the "144 Loan"). According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the 144 Loan, the defendants told investors that the term of the loan was approximately 60 days and promised that Agape would pay approximately 12% interest for those 60 days, which equates to an annual interest rate of approximately 73%.

As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment.  Indeed, they told investors that there was only a 1% risk of loss of their investment.  As a result, investors gave Agape approximately $40 million for the 144 Loan.[29]  A review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised approximately $21.2 million, $5.3 million, $3.4 million and $2.6 million, respectively, for the 144 Loan.

74.  The defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR knew that they raised more money than the amount of the 144 Loan.  A review of the binder containing the loan documents for the 144 Loan revealed that the actual amount of the loan was approximately $1.6 million.  In addition to having access to the binder containing that information, on June 26, 2008, the defendants and others received an email from Agape's bridge loan underwriter attaching the loan terms for the 144 Loan.  Specifically, the attachment indicated that the loan amount was approximately $1.6 million.  As set forth above, a review of records obtained during this investigation revealed that each of the defendants personally

---

[29]    This figure represents the total amount of money raised by Agape for the 144 Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

raised more than that. Indeed, KERYC raised approximately $21.2 million; MASSARO raised approximately $5.3 million; CICCONE raised approximately $3.4 million; and KAYLOR raised approximately $2.6 million. Accordingly, the defendants knowingly lied to investors when they assured them that their money would specifically be used to fund only the 144 Loan. A review of Agape bank records indicated that the money raised for the 144 Loan was used to pay other investors or for commodities trading. Despite this, the defendants continued to solicit and accept money from investors for Agape and AMA as set forth below.

75. In addition to informing the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR that they each raised more money than the amount of the 144 Loan, the attachment to the June 26, 2008 email further informed the defendants that the interest rate for the 144 Loan could not support the exorbitant profits that the defendants promised to their investors. Specifically, the attachment showed that the interest rate for the 144 Loan was only 16% for one year. But the defendants had promised to pay their investors 12% for 60 days, which equates to 73% for the year. Accordingly, the defendants knew that a 12% investment return for 60 days, which they promised to pay investors, could not come from the 144 Loan borrower.

76. A review of Agape bank records also revealed that Agape did not lend any money to 144 East 30th Street. Those

records indicated that, at the purported conclusion of the 144 Loan, investors received payments for purported returns on their investments and the defendants ANTHONY CICCONE and ANTHONY MASSARO received commissions for that loan, despite the fact that the 144 Loan was never made. Indeed, I have examined Agape checks payable to investors, CICCONE and MASSARO from Agape containing the name 144 E. 30th Street on the memo line of the check.

77. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the 144 Loan. Nor were they told that the money that they invested in the 144 Loan was being used for any purpose other than a bridge loan, or that the 144 Loan was never made. They also were not told that the money returned to them was actually money that was obtained from successive investors, rather than from the 144 Loan.

K.   **Carriage Homes Loan**

78. According to investors interviewed in connection with this investigation and records obtained during this investigation, in or about July 2008, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, contacted them about investing in a bridge loan known as Carriage Homes (the "Carriage Homes Loan").

According to investors and Agape contracts that the defendants, and others working at their direction, sent to investors in connection with the Carriage Homes Loan, the defendants told investors that the term of the loan was approximately 63 days and promised that Agape would pay approximately 12% interest for those 63 days, which equates to an annual interest rate of approximately 70%. As with the bridge loans described above, the defendants assured investors that there was little risk that they would lose money on this investment. Indeed, they told investors that there was only a 1% risk of loss of their investment. As a result, investors gave Agape approximately $139.4 million for the Carriage Homes Loan.[30] A review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised approximately $62.5 million, $17.6 million, $26.3 million and $6.5 million, respectively, for the Carriage Homes Loan.

79. According to a representative of Carriage Homes and a review of Agape bank records, Agape loaned Carriage Homes less than $250,000. That amount was significantly less than what the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, raised for that loan. In fact, as set forth above, each of the defendants,

---

[30]     This figure represents the total amount of money raised by Agape for the Carriage Homes Loan, which includes what the defendants raised as well as what other Agape account representatives raised.

and others working at their direction, personally raised more than the actual Carriage Homes Loan: KERYC raised approximately $62.5 million (250 times the actual amount of the loan); MASSARO raised approximately $17.6 million (70 times the actual amount of the loan); CICCONE raised approximately $26.3 million (105 times the actual amount of the loan); and KAYLOR raised approximately $6.5 million (26 times the actual amount of the loan).

80. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Carriage Homes Loan. Nor were they told that the money that they invested in the Carriage Homes Loan was being for any purpose other than a bridge loan.

81. During the same time period that Agape was soliciting investor money for the Carriage Home Loan, on July 24, 2008, the defendant JASON KERYC and a fellow Agape account representative, exchanged emails about how an Agape employee ("Employee 1"), whose identity is known to the government, possessed information that could bring down Agape if she lost her job and decided to talk. Specifically, KERYC wrote "[Employee 1] is a grimy bitch though. Sometimes she tells [Cosmo] everything but that is why I think he likes her." In response, KERYC's fellow account representative responded "Wow, Yea bro I don't trust her either bro . . . u kno the shot that would occur if she

lost her job . . . forget about it she would fuck up this whole place big time."

82. Shortly after that email communication, the defendant JASON KERYC voiced his displeasure with being asked questions about Agape's financial condition. Specifically, on August 5, 2008, one of KERYC's sub-brokers forwarded KERYC a list of questions posed by a potential investor about Agape's loan history and financial condition. In response, KERYC wrote "tell the client to lick my balls."

83. Slightly less than two months later, on September 22, 2008, Cosmo and the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR mailed a letter to all investors in which it was stated that the Carriage Homes borrower was unable to repay Agape in a timely manner and that Agape had granted the borrower an additional 90 days to repay the loan principal and interest. Cosmo also emailed a copy of that letter to the defendants.

84. At around this same time, Agape was struggling to raise sufficient funds to continue operating the Ponzi scheme. As a result, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR were asked to delay cashing commission checks and to lend Agape money. Additionally, Agape implemented a new policy that any investor wishing to withdraw money from Agape was required to meet with Cosmo first. Specifically, on September 23, 2008, KERYC, MASSARO, CICCONE, KAYLOR and others

received an email informing them that "[n]o accounts for [AMA] or [Agape] will be closed unless the client meets with Nicholas personally, as per his instructions."  On September 24, 2008, KAYLOR had an email exchange with Cosmo regarding an investor who wanted to withdraw money from Agape because his wife had lost her job.  Cosmo told KAYLOR that the investor would not be permitted to withdraw his money.  He also told KAYLOR to "tell him no don't take any money out and that you will go out on a date with him if he doesn't."

85.   At around this same time, Cosmo pressured the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and the defendants in turn pressured others working at their direction, to raise additional money and to convince investors to keep their money invested in Agape.  For example, on September 26, 2008, KERYC, MASSARO, CICCONE, KAYLOR and other Agape employees received a message from Cosmo stating:

> we NEED to start raising money as a firm.  I
> cannot stress this enough.  We have sent out
> over 50 million dollars in the last 60 days
> alone.  We need a few more successful loans
> to ride out the storm. . . It is imperative
> that you all raise funds for this short term
> loan.  We have not covered a check request in
> 6 months.  The firm assets under management
> has marketly decreased due to several
> different reasons.

Three days later, Cosmo told the defendants and other Agape employees in an email "[t]hrow your clients a bone so they stay with you through these times.  You will make money on them in the

near future.  If they are not hare [sic] after these next two
cycles you will not have a book of clients to call.  Some of you
are almost out of business as we speak so I suggest you don't cut
down your clients too much."

L.    **Bed Four Loan**

86.    In or about September 2008, while Cosmo and the
defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and
DIANE KAYLOR  attempted to keep the Ponzi scheme going, another
bridge loan known as Bed Four (the "Bed Four Loan") was offered
to investors.  According to investors interviewed in connection
with this investigation and Agape contracts that the defendants,
and others working at their direction, sent to investors in
connection with the Bed Four Loan, the defendants, and others
working at their direction, told investors that the term of the
loan was approximately 72 days and promised that Agape would pay
approximately 12% interest for those 72 days, which equates to an
annual interest rate of approximately 61%.  As with the bridge
loans described above, the defendants assured investors that
there was little risk that they would lose money on this
investment.  Indeed, they told investors that there was only a 1%
risk of loss of their investment.  As a result, investors gave
Agape approximately $42.1 million for the Bed Four Loan.[31]  A

---

[31]    This figure represents the total amount of money raised
by Agape for the Bed Four Loan, which includes what the
defendants raised as well as what other Agape account
representatives raised.

review of records obtained during this investigation revealed that KERYC, MASSARO, CICCONE and KAYLOR, and others working at their direction, raised approximately $21.8 million, $5.3 million, $3.3 million and $3.1 million, respectively, for the Bed Four Loan.

87. A review of the binder containing the loan documents for the Bed Four Loan revealed that the amount of the purported loan was approximately $4.1 million. A review of records obtained during this investigation revealed that the defendants JASON KERYC and ANTHONY MASSARO, and others working at their direction, personally raised more than the amount of the loan contained in the binder and, as the defendants knew, Agape employed other brokers who were also raising money for this loan. Indeed, as set forth above, Agape raised approximately $42.1 million for that loan.

88. According to a review of Agape bank records, an interview of an Agape employee ("Employee 2"), whose identity is known to the government, and emails between Employee 2 and Cosmo, Agape did not lend any money to Bed Four. The defendant DIANE KAYLOR knew that, despite the fact that she had raised approximately $3.1 million for the Bed Four Loan, Agape never made a loan to Bed Four. In December 2008, according to an interview of Employee 2, Employee 2 told KAYLOR that Agape never loaned Bed Four any money. Despite knowing this, KAYLOR continued to raise money for Agape. She also, on December 29,

2008, submitted a request exceeding $1 million to Agape's accounting department asking for her investors' purported returns on their investment in the Bed Four Loan and asked to be paid her commission for that loan, despite the fact that she knew that the Bed Four Loan was never made.  KAYLOR also falsely told investors, in an email, that the Bed Four Loan was in default and that "[t]he contract[] closed and could not be funded by the borrowers."  That was a lie because KAYLOR well knew that Agape never made a loan to Bed Four.

89.  None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors that have been interviewed in connection with this investigation were told that Agape had raised more money than was needed for the Bed Four Loan.  Nor were they told that the money that they invested in the Bed Four Loan was being used for any purpose other than a bridge loan to Bed Four.  Finally, they were not told that Agape did not lend money to Bed Four.

**M.   November 3, 2008 to January 26, 2009**

90.  On November 3, 2008, Cosmo wrote an email to the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and other Agape employees, advising them that Agape was "now on extension/ default on every loan we did last year." That included several bridge loans, such as Gala Resources, United Steel, Carillon Park and Clemson Grande, which should have

been repaid months earlier. According to Agape bank records, investors were paid returns on their investment for those bridge loans prior to November 3, 2008. In addition, the defendants were paid commissions for raising money for those loans prior to November 3, 2008.

91. In addition to advising the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR that all the loans that were made in the prior year were on extension or default, Cosmo admonished the defendants that "[a]ny one sharing this email will be terminated." The defendants heeded Cosmo's warning. None of the defendants JASON KERYC's, ANTHONY MASSARO's, ANTHONY CICCONE's and DIANE KAYLOR's investors interviewed in connection with this investigation were told Agape was "on extension/ default" on all the bridge loans that it made in 2007. Not only did MASSARO hide this material fact from investors, but, on December 9, 2008, he sent a letter to his investors in which he falsely represented the state of Agape's bridge loan business. Specifically, MASSARO wrote that the Carriage Homes Loan was Agape's "only extended loan." MASSARO knew that this statement was false because Cosmo had specifically advised him and others that Agape was "on extension/default on every loan [they] did last year."

92. In addition to concealing the state of Agape's affairs from its investors, the defendants JASON KERYC, ANTHONY

MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at

their direction, continued to raise millions of dollars for

Agape. For example, on December 8, 2008, KAYLOR sent an email to

investors asking them to keep investing in Agape, despite knowing

that all its prior years' loans were in extension or default.

Specifically, KAYLOR wrote:

> Agape has been very good to all of us and the
> money has been flowing very strongly for a
> long time. Now it's our turn to give back to
> the company with keeping our money where it
> is and trusting the changes. So we will have
> a company that will continue to make us all a
> lot of money in the future.

A review of Agape bank records revealed that between November

2008 and January 26, 2009, the defendants, and others working at

their direction, raised approximately $17.4 million in new money

for Agape and AMA.[32] KERYC raised approximately $12.2 million;

MASSARO raised approximately $2.5 million; CICCONE raised

approximately $1.6 million; and KAYLOR raised approximately $1.1

million.

93. Despite the fact that the defendant ANTHONY

CICCONE actively solicited investors for Agape and AMA between

November 3, 2008 and January 26, 2009, he advised me not to

invest in Agape. During the course of this investigation, acting

in an undercover capacity, I posed as both an investor and a

---

[32]     As described above, new money does not include money
that the defendants convinced investors to roll over from a prior
bridge loan. It only includes money raised from new investors or
additional money raised from prior investors.

borrower at different times. In those roles, I communicated with several employees of both companies, including CICCONE, and investors about their investments, how they became involved with Agape or AMA, and what representations had been made to them. Soon after I began talking to investors, CICCONE contacted me. On November 5, 2008, I had a lengthy telephone conversation with CICCONE, which conversation was recorded. During that conversation, CICCONE stated that some investors were not getting paid because there was a loan that was overdue. CICCONE asked why I was talking to investors and asked me to stop because he was afraid they would get nervous. I told him I was interested in investing and he told me that he thought I was doing an investigation.[33] At some point in the conversation, CICCONE discouraged me from investing, stating: "Now isn't a good time. Not that it's a scam or anything. It's just that I had a deal that was on extension. So I was a little -- I don't own the company. I'm a broker."

94. According to an interview of one of the defendant ANTHONY CICCONE's investors, who was an individual with whom CICCONE grew up ("Investor 4") and whose identity is known to the government, CICCONE told Investor 4 that he had advised me that it was a bad time to invest in Agape. Investor 4, who had approximately $80,000 invested in Agape, was upset and demanded

---

[33]    Although I was posing as a potential investor, CICCONE was aware that I am employed by the USPIS.

to know the truth about Agape. In response, CICCONE told him to pull his money out of Agape. At that point, Investor 4 tried to withdraw his money, but was unsuccessful. None of the defendants' other investors that were interviewed in connection with this investigation were told, in November 2008 or thereafter, by CICCONE, or any of the other defendants, that it was a bad time to invest in Agape. To the contrary, between November 2008 and January 2009, CICCONE persuaded individuals to invest approximately $1.6 million in new money in Agape.

95. On November 18, 2008, during a meeting that was attended by Cosmo, the defendant JASON KERYC and others, which meeting was recorded by a former Agape employee, Cosmo admitted that Agape overpaid its investors. Further, Cosmo stated:

> With the people that are going around looking
> at us, if we bounce a fucking check, excuse
> my language, we're done. Alright? They're
> waiting. They're waiting for a reason to
> come in through the doors. Now this could be
> my own paranoia or whatever else it might be,
> or it could be justified.

In response to a question of what his biggest fear was, Cosmo replied "Another 10 million dollars leaves the company . . . That's my biggest fear . . . That's the only fear I have." Cosmo once again informed KERYC and other Agape employees that "right now we have 20 million dollars in principal that's owed to us . . . from loans that we did last year . . . all '07 . . . 20 million dollars worth of loans that have not paid back. We were supposed to start getting back in June. So, uh, you know, the Clemson

Grande, X-Arena, United Steel, Northway, uh, Lyons." He also told KERYC and others that "we've got 8 or 9 loans right now that are either on default or extension from '07." By that date, those loans should have been repaid. According to Agape bank records, investors received payments for purported returns on their investments in those loans, and all four of the defendants received commissions for raising money for those loans. Cosmo also told KERYC that "we don't make 80% a year on our money."

96. At around this same time, between October 2008 and January 2009, when investors became concerned that they may lose their investments, the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR, and others working at their direction, preyed on that fear by offering a fictitious insurance policy. According to investors interviewed in connection with this investigation and records obtained during this investigation, the defendants falsely told investors that the PPP insurance plan would protect their investments. The defendants represented to investors that individuals who purchased the PPP insurance plan would own a portion of the liens that purportedly secured repayment of the bridge loans. But there was no insurance plan. A review of Agape bank records revealed that the defendants, and other Agape employees, collectively raised approximately $865,000 for the PPP insurance plan.

97. On January 26, 2009, law enforcement officers executed search warrants at the Agape Offices and arrested Cosmo.

A review of Agape records indicated that, between October 2003 and January 2009, over 5,000 individuals invested over $400 million in Agape and AMA.  Of those 5,000 investors, approximately 4,100 investors lost a total of approximately $179 million.

WHEREFORE, your deponent respectfully requests that the Court issue arrest warrants so that the defendants JASON KERYC, ANTHONY MASSARO, ANTHONY CICCONE and DIANE KAYLOR may be dealt with according to law.

Because premature disclosure of the contents of this Complaint and Affidavit in Support of Arrest Warrants would jeopardize an ongoing investigation and could result in flight of the defendants, targets and subjects, destruction of evidence and intimidation of witnesses, it is further requested that this

70

Affidavit and accompanying arrest warrants be sealed and remain

under seal until further order of the Court.


RICHARD CINNAMO
USPIS



Sworn to before me this
___ day of April, 2012

E. THOMAS BOYLE, MJ

UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK